FILED

2022 Jul-26  PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **and** } | |
| } | |
| **VINCENT JACKSON,** } | **Case No.: 2:17-cv-01649-MHH** |
| } | |
| **Plaintiff-Intervenor,** } | |
| **v.** } | |
| } | |
| **DOLGENCORP, LLC,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OPINION</u>

In this case, the Equal Employment Opportunity Commission, on behalf of unsuccessful Dollar General job applicants, challenges Dollar General's hiring practices. Vincent Jackson, one of the unsuccessful job applicants, challenges Dollar General's hiring practices individually, (Docs. 1, 41). The EEOC and Mr. Jackson contend that Dollar General violated the Americans with Disabilities Act and the Genetic Information Nondiscrimination Act because, when hiring general warehouse workers for its Bessemer, Alabama facility, the company used a post-offer medical examination that screened out some applicants based on actual or

perceived disabilities.  Third-party Middle Creek Medical Center conducted the medical exams for Dollar General.[1]

The EEOC and Dollar General have filed cross motions for summary judgment on the employees' GINA claim.[2]  Dollar General has filed a motion for summary judgment on the plaintiffs' ADA claims.  This opinion resolves these pending motions.  The opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment.  Then, consistent with the summary judgment standard, the Court identifies the evidence that the parties have

---

[1] Mr. Jackson's complaint, (Doc. 41), is nearly identical to the EEOC's complaint, (Doc. 1).  In their complaints, in addition to their GINA claims, the EEOC and Mr. Jackson bring three ADA claims:  a claim under 42 U.S.C. § 12112(a); a claim under 42 U.S.C. § 12112(b)(6); and a claim under 42 U.S.C. § 12112(d)(3).  Mr. Jackson's claims and the EEOC's claims rest on identical factual allegations.  Therefore, the Court analyzes Mr. Jackson's claims and the EEOC's claims together and cites to the EEOC complaint when discussing the plaintiffs' allegations.

Plaintiffs may plead multiple ADA claims, but to pursue those claims simultaneously, the plaintiffs must allege a distinct factual basis for each clam.  *Jean-Pierre v. Naples Cmty. Hosp., Inc.*, 817 Fed. Appx. 822, 828 (11th Cir. 2020).  Where plaintiffs' ADA claims under various statutory provisions rest on identical factual allegations, the alternative claims are duplicative and do not require separate analysis on a motion for summary judgment.  *Jean-Pierre*, 817 Fed. Appx. at 828.

The plaintiffs brought their § 12112(d)(3) claim under a separate count, (Doc. 1, pp. 8-9; Doc. 41, pp. 8-9), but no plaintiff alleges a distinct factual basis for this claim.  Rather, the plaintiffs reiterate their uniform factual allegations, noting that Dollar General "used the results of its post-offer medical examinations to screen out qualified individuals with disabilities using criteria that are neither job-related nor consistent with business necessity." (Doc. 1, p. 9, ¶ 29; Doc. 41, p. 9, ¶ 29).  The quoted language is copied directly from § 12112(b)(6).  Thus, the Court regards the plaintiffs' § 12112(d)(3) claim as duplicative of the plaintiffs' § 12112(b)(6) claim.

Accordingly, the Court analyzes two ADA claims:  the plaintiffs' § 12112(b)(6) claim on behalf of the entire "ADA class" and the plaintiffs' § 12112(a) claim on behalf of Mr. Jackson.  The Court will address whether the § 12112(a) claim was properly pleaded later in the opinion.

[2] Mr. Jackson has not moved for summary judgment on his GINA claim separately.

submitted.  Finally, the Court evaluates the evidence under the governing legal standards, considering first the ADA claims and then the GINA claim.

# I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).  When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences from that evidence in favor of the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a

matter of law on the facts that are not disputed.  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Alabama Municipal Ins. Corp. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (quoting *Southern Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014)).  "Cross motions for summary judgment may be probative of the nonexistence of a factual dispute.  Indeed, when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment." *Shook v. U.S.*, 713 F.2d 662, 665 (11th Cir. 1983) (internal citation omitted).

## II.

Dollar General, a national discount retailer, operates a distribution center in Bessemer, Alabama.  (Doc. 103-2, pp. 22-23, tpp. 21-22).  The Dollar General distribution center receives retail products, stores them, and distributes the products to the company's retail locations.  Warehouse workers manage the product traffic at the Bessemer facility.  (Doc. 103-2, pp. 56-64, tpp. 55-63).

To hire employees for its Bessemer distribution center, Dollar General uses a multi-step process.  When an individual applies for a job as a Dollar General general warehouse worker, she must submit an online application.  (Doc. 103-2, p. 41, tp. 40).  Dollar General's HR department interviews applicants, either in person or by phone.  (Doc. 103-2, p. 41, tp. 40).  Applicants who pass the first interview then

interview on-site at the distribution center with a warehouse supervisor. (Doc. 103-2, pp. 41-42, tpp. 40-41). Following the on-site interview, some applicants receive a job offer contingent on a pre-employment background check, physical examination, and drug test. (Doc. 103-2, p. 47, tp. 46). Applicants receiving a contingent job offer from the Bessemer facility must visit Middle Creek Medical Center for a physical examination and drug test. (Doc. 103-2, p. 47, tp. 46).

Middle Creek Medical Center is an urgent care center. (Doc. 104-19, p. 23, tp. 22). In addition to treating "episodic medical conditions," Middle Creek offers "pre-employment physicals, drug screens, and hearing tests." (Doc. 104-19, pp. 23, 24, tpp. 22, 23). In 2011, Middle Creek verbally agreed to provide pre-employment medical services for Dollar General. (Doc. 104-19, pp. 25-26, tpp. 24-25). In January of 2012, Middle Creek began performing pre-employment medical examinations for Dollar General. (Doc. 104-19, p. 43, tp. 42).

At the beginning of a physical examination, a job candidate must complete a "Physical Encounter Questionnaire" designed by Dollar General. (Doc. 104-19, p. 59, tp. 58). The questionnaire includes a series of "yes" or "no" questions. (Doc. 104-19, p. 316). The questions are divided into several categories, one of which is "Medical History." (Doc. 104-19, p. 316). For a period of time, the "Medical History" section contained the following question: "Have your grandparents, parents, or children had significant medical problems?" (Doc. 104-19, p. 316). After

job candidates completed the questionnaire, Middle Creek staff question candidates about the candidates' family medical history. (*See e.g.*, Doc. 102-9, p. 8; Doc. 105-1, p. 61, tp. 59).[3]  On August 22, 2014, Dollar General sent Middle Creek an updated questionnaire without the question about family medical history.  (Doc. 102-7, p. 8).[4]

_____

[3] According to Brittney Busbee, a medical professional at Medical Creek, Dollar General job candidates were asked follow-up questions about their family history only if they indicated on the questionnaire that their grandparents, parents, or children had significant medical problems.  (Doc. 105-1, pp. 61-62, tpp. 59-60).

[4] The updated questionnaire was attached to an email from Rick Sumner, Director of Insurance and Safety at Dollar General.  The email states:

> Dear Carla [Busbee],
>
> Thank you for administering Dollar General's post offer, pre-employment physical evaluation.  Please ensure that you are using the updated attached documents and forms when administering the evaluation.  I have also attached a document that generally outlines the process for the evaluation.  As you are aware, the Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by the law.  Genetic information as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductions services.  To help ensure continued compliance with this law, when relaying the results of the evaluation, you should not provide Dollar General with any genetic information about the candidate.  You should only inform Dollar General (on the form provided) whether the candidate is qualified, not qualified or referred to his or her PMD.  Please do not provide any other information to Dollar General.  Please ensure these new documents are implemented immediately.
>
> Please do not hesitate to contact me with questions or concerns about this information.
>
> Regards,

In addition to collecting information in writing about candidates' medical history, Middle Creek staff take the candidate's vitals and perform a vision test, a urinalysis, a hearing evaluation, and a physical examination "including [a] hernia check for males." (Doc. 104-19, p. 362). Middle Creek uses a form labeled "Dollar General Physical Requirements" which lists the following benchmarks for a "qualified" rating:

> NOT Qualified if [blood pressure] > 160/100
>
> Vision must be 20/50 or better
>
> If color blind, [employee] still passes
>
> MUST pass peripheral vision screen

(Doc. 104-19, p. 362).[5] The form instructs Middle Creek staff to fax to Dollar General the final page of the questionnaire, indicating whether the candidate was

---

Rick Sumner

(Doc. 102-7, p. 2).

[5] The parties dispute whether Dollar General or Middle Creek set these requirements, especially the benchmarks for vision and blood pressure. Nick Orefice, Dollar General's HR Generalist, opined during his deposition that these requirements were likely created at Dollar General's "corporate level." (Doc. 103-1, pp. 64-65, tpp. 63-64). Carla Busbee, Middle Creek's 30(b)(6) representative, also indicated that these requirements came from Dollar General. (Doc. 104-19, pp. 74, 101, 103, tpp. 73, 100, 102). Elizabeth Deslattes, a nurse practitioner at Middle Creek, suggested that Middle Creek may have come up with the requirements. (Doc. 104-1, pp. 96-97, tpp. 95-96). Similarly, Rick Sumner stated he thinks Middle Creek developed the checklist and that it was not provided by Dollar General. (Doc. 104-21, p. 154, tp. 153).

This fact is relevant only to the plaintiffs' ADA claims, not their GINA claim. And for purposes of the ADA claims, because only Dollar General moves for summary judgment, the Court views this evidence in the light most favorable to the non-movants, the EEOC and Mr. Jackson. Thus,

qualified, not qualified, or referred to a primary medical doctor for further evaluation. (Doc. 104-19, p. 362). Middle Creek complies. (Doc. 104-1, p. 71, tp. 70; Doc. 103-2, pp. 28-29, tpp. 27-28).

"Qualified" means that the person was "medically capable of performing the job." (Doc. 104-1, pp. 106-07, tpp. 105-06). "Referred to PMD" sometimes means that the person was not qualified to do the job; it also may mean that Middle Creek felt it needed more information before making a final determination. (Doc. 104-1, p. 107, tp. 106). According to Elizabeth Deslattes, a nurse practitioner at Middle Creek, rating a candidate "not qualified" "didn't necessarily mean they weren't physically able to do the job." (Doc. 104-1, p. 107, tp. 106).

The job applicants represented by the EEOC, including Mr. Jackson, received ratings of either "not qualified" or "referred to PMD." None of the applicants became an employee of Dollar General. Mr. Jackson was rated "not qualified" after failing the vision test. (Doc. 102-9, p. 11). According to Dollar General, Mr. Jackson refused to complete the physical examination after being informed that he failed the vision test. (Doc. 102-9, p. 11). Mr. Jackson testified that he wanted to finish the examination. (Doc. 105-8, p. 266, tp. 265). The Court accepts Mr.

---

for purposes of this opinion, the Court assumes that Dollar General provided these requirements to Middle Creek.

Jackson's version of the facts for purposes of Dollar General's summary judgment motion.

### III.

*ADA "Screen Out" Claim*

The EEOC and Mr. Jackson assert that the pre-employment medical examination that Middle Creek conducted on behalf of Dollar General screened out the 24 job applicants the EEOC represents in this case in violation of the ADA.  The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in job application procedures" or hiring or "other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The statute identifies seven categories of conduct that constitute discrimination.  42 U.S.C. § 12112(b).  Here, the EEOC brings its "screen out" claim under subsection (b)(6).  Section 12112(b)(6) prohibits an employer from discriminating against a qualified individual on the basis of disability by:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6).  Dollar General contends that the Court must evaluate a § 12112(b)(6) claim as a disparate impact claim and that a plaintiff must offer

comparative statistical evidence to prove a disparate impact claim, something neither the EEOC nor Mr. Jackson has done.  (Doc. 110, pp. 14-18).

Employment discrimination claims typically fall into two buckets:  disparate treatment claims and disparate impact claims.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003).  As its name suggests, in a disparate treatment case, a plaintiff must establish that his employer "simply treats some people less favorably than others" because of a protected characteristic, here a disability.  *Raytheon*, 540 U.S. at 52. The "because of" requirement speaks to the employer's intent to discriminate against a job applicant or an employee based on a protected trait.  *Raytheon*, 540 U.S. at 52. In contrast, disparate impact claims examine the way in which employment policies and practices disproportionately *effect* certain job applicants or employees:

> disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters, supra*, at 335–336, n. 15, 97 S.Ct. 1843. Under a disparate-impact theory of discrimination, "a facially neutral employment practice may be deemed [illegally discriminatory] without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case."

*Raytheon*, 540 U.S. at 52-53 (quoting *Teamsters v. United States*, 431 U.S. 324, 335-36 n.15 (1977) & *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645-46 (1989)). "Because 'the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes,' *Texas Dept. of Community Affairs v.*

*Burdine*, 450 U.S. 248, 252, n. 5, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), courts must be careful to distinguish between" disparate treatment claims and disparate impact claims. *Raytheon*, 540 U.S. at 53.

In *Raytheon*, the plaintiff, Mr. Hernandez, pleaded only a disparate treatment claim in his complaint. *Raytheon*, 540 U.S. at 49. At summary judgment, Mr. Hernandez began to weave disparate impact concepts into his opposition to Raytheon's dispositive motion. *Raytheon*, 540 U.S. at 49. The Court of Appeals held that the district court properly selected the *McDonnell Douglas* burden-shifting framework to evaluate Mr. Hernandez's ADA claim because Mr. Hernandez pleaded only a disparate treatment claim; the Court of Appeals found that Mr. Hernandez waited too long to attempt to pursue a disparate impact claim. *Raytheon*, 540 U.S. at 49. At the first stage of the burden-shifting framework, the Court of Appeals concluded that Mr. Hernandez established a prima facie case of discrimination. *Raytheon*, 540 U.S. at 49-50. At the second stage, the stage at which Raytheon merely had to identify, not prove, a facially legitimate reason for its employment decision, the Court of Appeals mistakenly evaluated the merits of the rehire policy that Mr. Hernandez challenged. *Raytheon*, 540 U.S. at 51-52.[6] Raytheon's rehire

_____

[6] In *Raytheon*, the Supreme Court outlined the *McDonnell Douglas* framework as follows:

> The Court in *McDonnell Douglas* set forth a burden-shifting scheme for discriminatory-treatment cases. Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment

policy, neutral on its face, was "by definition, a legitimate, nondiscriminatory reason under the ADA" for Raytheon to refuse to rehire Mr. Hernandez. *Raytheon*, 540 U.S. at 51-52. The Court of Appeals criticized the policy under the ADA because the policy operated to exclude from rehire recovered addicts. The Supreme Court rejected the Court of Appeals' analysis and explained that at stage two, the impact of the policy on addicts was irrelevant. The Supreme Court held that at stage two, the Court of Appeals should have deemed Raytheon's facially-neutral rehire policy a non-discriminatory reason for the company's hiring decision and proceeded to stage three to examine Mr. Hernandez's evidence of discriminatory intent. *Raytheon*, 540 U.S. at 51-52. The Supreme Court noted that by considering the impact of Raytheon's rehire policy on addicts at stage two, "the Court of Appeals erred by conflating the analytical framework for disparate-impact and disparate-treatment claims." *Raytheon*, 540 U.S. at 51.

Mindful of the Supreme Court's instruction that courts must be careful to distinguish between disparate treatment claims and disparate impact claims, *Raytheon*, 540 U.S. at 53, we turn to the EEOC's allegations against Dollar General

---

action. 411 U.S., at 802, 93 S.Ct. 1817. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

*Raytheon*, 540 U.S. at 49 n.3.

to identify the ADA claims at issue in this case.  The EEOC alleges that Dollar General:

> discriminated against Jackson, a qualified individual with a disability, and a class of qualified individuals with disabilities, when it failed to hire Jackson and the [ADA class] for general warehouse positions because of disability, perceived disability and/or record of disability. [Dollar General] further discriminated against Jackson and the class when it used post-offer medical examinations to screen out individuals with disabilities by means of exclusionary criteria that were neither job-related nor consistent with business necessity.

(Doc. 1, pp. 1-2; *see also* Doc. 41, pp. 1-2).  The first sentence identifies a disparate treatment claim concerning Dollar General's decision not to hire Mr. Jackson because of his alleged actual or perceived disability.[7]  The second sentence concerns a screen out claim.  The "ADA Class" for the screen out claim consists of Mr. Jackson and 23 other individuals who Middle Creek, on Dollar General's behalf, screened out in the hiring process based on vision, blood pressure, or blood sugar. (Doc. 1, p. 7, ¶¶ 25(b)-(f)).  As mentioned, the EEOC asserts the disparate treatment

---

[7] *See Raytheon*, 540 U.S. at 53 (explaining "that respondent's case was limited to a disparate-treatment theory, that the company refused to rehire respondent because it regarded respondent as being disabled and/or because of respondent's record of a disability").

The EEOC mentions an "ADA class" in its description of its disparate treatment claim, but the EEOC provides factual allegations to support a disparate treatment claim only for Mr. Jackson.  In the parties' Rule 26 report, the EEOC characterizes its class claim as a medical screening claim. (Doc. 37, p. 2).  The Court regards the EEOC's disparate treatment claim as only an individual claim for Mr. Jackson.  Mr. Jackson asserts an individual disparate treatment claim in his complaint.  (Doc. 41, pp. 5-8, ¶¶ 22-24).

claim and the screen out claims pursuant to 42 U.S.C. §§ 12112(a) and (b)(6).  (Doc. 1, pp. 5, 7, ¶¶ 22, 25).

Some courts have held that § 12112(b)(6) pertains only to disparate impact claims.  *See*, *e.g.*, *Fulbright v. Union Pacific Railroad Co.*, No. 3:20-CV-2392-BK, 2022 WL 625082, at *3 (N.D. Tex. Mar. 3, 2022); *EEOC v. BNSF Railway Co.*, NO. C14-1488 MJP, 2016 WL 98510, at *5 (W.D. Wash. Jan. 8, 2016).  Dollar General urges the Court to follow suit in this case.  Other courts have allowed plaintiffs to pursue disparate treatment claims under § 12112(b)(6).  *See*, *e.g.*, *Gonzales v. City of New Braunfels*, *Tex.*, 176 F.3d 834, 839 (5th Cir. 1999) (examining medical screening claim by individual plaintiff as a disparate treatment claim and noting that plaintiff did not plead a disparate impact claim under § 12112(b)(6)); *Toole v. Metal Services, LLC*, 17 F. Supp. 3d 1161 (S.D. Ala. 2014) (applying the *McDonnell Douglas* framework, though noting the plaintiff alleged that the physical examination had a "disparate impact" on the plaintiff).  Neither the Supreme Court nor the Eleventh Circuit Court of Appeals has held explicitly that a plaintiff may pursue only a disparate impact claim under § 12112(b)(6).

Dicta in *Raytheon* undergirds the argument that § 12112(b)(6) pertains only to disparate impact claims.  In *Raytheon*, in discussing the Court of Appeals' erroneous analysis of the substance of Raytheon's rehire policy at stage two of the *McDonell Douglas* framework, the Supreme Court commented:

> [T]he Court of Appeals observed that petitioner's policy "screens out persons with a record of addiction," and further noted that the company had not raised a business necessity defense, factors that pertain to disparate-impact claims but not disparate-treatment claims.

*Raytheon*, 540 U.S. at 54 (citation to Court of Appeals' decision omitted); *see Fulbright*, 2022 WL 625082 at *3 ("The Supreme Court appears to have also positioned section 12112(b)(6) exclusively in the disparate-impact category, although it has not definitively held as much.") (citing *Raytheon*, 540 U.S. at 53).[8]

---

[8] *In Raytheon*, the Supreme Court appears to associate disparate treatment claims with the language of § 12112(b)(3) and disparate impact claims with the language of § 12112(b)(6). Using the language of these two subsections, the Supreme Court wrote:

> Both disparate-treatment and disparate-impact claims are cognizable under the ADA. See 42 U.S.C. § 12112(b) (defining "discriminate" to include "utilizing standards, criteria, or methods of administration ... that have the effect of discrimination on the basis of disability" and "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability").

540 U.S. at 53. By identifying disparate-treatment claims first and using the language of § 12112(b)(3) first in its parenthetical, the Supreme Court seemed to link disparate-treatment claims with § 12112(b)(3) and disparate-impact claims with § 12112(b)(6).

This Court observes that, because it speaks of standards that have the "effect" of discriminating, § 12112(b)(3), rather than § 12112(b)(6), seems to address disparate-impact claims. In its entirety, § 12112(b)(3) provides that an employer discriminates against a qualified individual on the basis of a disability by:

> (3) utilizing standards, criteria, or methods of administration--
>
> > (A) that *have the effect of discrimination* on the basis of disability; or
>
> > (B) that perpetuate the discrimination of others who are subject to common administrative control[.]

42 U.S.C. § 12112(b)(3) (emphasis added). In contrast, § 12112(b)(6) speaks to standards and employment tests that expressly "screen out" individuals on the basis of disability, a direct form of selective hiring. Respectfully, the Court tends to think that Congress attempted to capture

Importantly, *Raytheon* concerned a facially-neutral hiring policy.  The Supreme Court stated that courts dealing with facially-neutral policies and procedures must evaluate the effect of the policy on a suspect group; the employer's intent is not at issue in those cases.  *Raytheon*, 540 U.S. at 52-53.

In *Raytheon*, the company "had a policy against rehiring employees who were terminated for workplace misconduct."  *Raytheon*, 540 U.S. at 47.  Because Mr. Hernandez's separation summary indicated that he previously had left his job at Raytheon because of employee misconduct, the employee who reviewed Mr. Hernandez's application for rehire declined the application.  The employee who made the hiring decision indicated that she did not know that the misconduct for which Mr. Hernandez lost his job was drug abuse, but the record revealed that Mr. Hernandez submitted with his job application a letter from an Alcoholics Anonymous counselor, suggesting that the employee who declined Mr. Hernandez's application for rehire may have been aware of Mr. Hernandez's record of addiction.  *Raytheon*, 540 U.S. at 47.  Still, Raytheon's rehire policy was not targeted at actual or perceived disabilities; the policy embraced all categories of employee misconduct.  The Supreme Court emphasized this point throughout its opinion, describing Raytheon's informal rehire policy as a "neutral company policy" that was

---

disparate-impact claims under § 12112(b)(3) and disparate-treatment screen out claims under § 12112(b)(6).

"lawful on its face."  *Raytheon*, 540 U.S. at 50-51.  In this context, the Supreme Court indicated that courts should evaluate facially-neutral employment policies as disparate impact claims.  *Raytheon*, 540 U.S. at 52-53 (citing *Atonio*, 490 U.S. at 645-46).

The plain language of § 12112(b)(6) does not limit discrimination actions brought under the subsection to actions involving facially-neutral employment policies.  As discussed, § 12112(b)(6) prohibits an employer from discriminating against a qualified individual on the basis of disability by:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C. § 12112(b)(6).  Qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities may appear in a facially-neutral employment policy, but employers also may adopt policies that expressly and intentionally screen out individuals with disabilities.  In the latter category of screen out cases, the employment policy constitutes direct evidence of discriminatory intent.  An employer attempting to avoid liability for disparate treatment of employees based on its screening policy may do so by establishing that the screening

standard is "job-related for the position in question" and "consistent with business necessity." 42 U.S.C. § 12112(b)(6).

The Sixth Circuit Court of Appeals discussed direct evidence "screen out" cases in *Monette v. Electronic Data Systems, Corp.*, 90 F.3d 1173 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012). The Court of Appeals explained that "employers often rely on an employee's disability in making employment decisions, a fact rarely present in Title VII race or gender discrimination cases" and that "when an employer admits (or the evidence establishes) that its decision was based upon the employee's disability, direct evidence of discrimination exists." *Monette*, 90 F.3d at 1180. In direct evidence cases, courts do not need to use the *McDonnell Douglas* burden-shifting framework for cases that rest on circumstantial evidence of discriminatory intent or the disparate impact analysis attendant to facially-neutral employment policies that have a disproportionate effect on a protected group. *Monette*, 90 F.3d at 1180. Instead, when an employer relies partially or entirely on an applicant's disability in making a hiring decision, to prove his ADA claim, an applicant either may establish that he can perform the requirements of the job despite his disability or he may "challenge[] a particular job requirement as unessential." *Monette*, 90 F.3d at 1182. In the latter instance, the employer "bears the burden of proving that a particular hiring policy is 'job-related' and 'consistent with business necessity;'"

the job applicant "retains the burden of proving that he or she is qualified to perform the essential functions of the job absent the challenged job requirement." *Monette*, 90 F.3d at 1184; *see also Rohr v. Salt River Project Agricultural Imp. & Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009) ("Once an employee shows that a qualification standard tends to screen out an individual with a disability, the employer shoulders the burden of proving that the challenged standard is job-related and consistent with business necessity.").

The Court finds the reasoning of *Monette* persuasive. Therefore, the Court rejects Dollar General's contention that § 12112(b)(6) pertains only to disparate impact claims and that a plaintiff may prove a discrimination claim under § 12112(b)(6) only by offering comprehensive statistical evidence. Another feature of the plain language of § 12112(b)(6) bolsters this conclusion. Generally, under employment discrimination statutes, plaintiffs bring disparate impact claims on behalf of groups of applicants or employees who suffer disproportionate harm because of an employer's facially-neutral policy, and plaintiffs establish those claims with statistical evidence. *Raytheon*, 540 U.S. at 52-53; *Hallmark Developers, Inc. v. Fulton County, Georgia*, 466 F.3d 1276, 1286 (11th Cir. 2006) ("Typically, a disparate impact is demonstrated by statistics."). But under the ADA, § 12112(b)(6) expressly authorizes not only class claims but also individual claims based on an employer's screening policy. 42 U.S.C. § 12112(b)(6). In other words,

a disabled individual may assert a claim under § 12112(b)(6) and may prove that his employer's qualification standards, employment tests, or other selection criteria screened him out. *Gonzales*, 176 F.3d at 839 n.26 ("In the ADA context, a plaintiff may satisfy the second prong of his prima facie case by demonstrating an adverse impact on himself rather than on an entire group. 1 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 333–34 (3d ed.1996)."); *Williams v. ABM Parking Services Inc.*, 296 F. Supp. 3d 779, 789 (E.D. Va. 2017) ("[A] disparate impact claim under the ADA differs from a disparate impact claim under other federal statutes, such as Title VII. Under § 12112(b)(6), claims can be brought either by an individual plaintiff or by a class of individuals. . . . [A]n ADA disparate impact claim need not present statistical evidence if he or she can show that a job qualification screens out the plaintiff on the basis of his or her disability.").[9]

---

[9] In support of its argument that the EEOC must produce statistical evidence to prove its disparate impact claim, Dollar General cites *Smith v. Miami-Dade County*, 621 Fed. Appx. 955 (11th Cir. 2015). In *Smith*, the Eleventh Circuit stated:

> Further, to establish a *prima facie* case of disparate impact, a plaintiff must provide comparative evidence showing that a policy has a disparate impact on the disabled. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir.2008) (holding that a district court correctly rejected a disparate-impact claim because the plaintiff completely failed to present relevant comparative evidence). It is not sufficient to show that a few people are affected by a policy. *See id.* ("[S]imply showing that a few houses are affected by an ordinance does not come close to establishing disparate impact."). The disparity of the evidence provided must be substantial enough to raise an inference of causation. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314 (11th Cir.1994).
>
> [The plaintiff]'s disparate-impact claim stems from [the defendant]'s no-rehire policy, which prevents former employees with a history of long-term absences from

For an individual to prove a prima facie screen out claim under § 12112(b)(6) of the ADA, a plaintiff "must (i) identify the challenged employment practice or policy, (ii) demonstrate that the practice or policy had an adverse impact on the plaintiff with a disability, and (iii) demonstrate a causal relationship between the identified practice and the [adverse] impact." *Williams*, 296 F. Supp. 3d at 789 (citing generally *Gonzalez*, 176 F.3d 834). "To assert a business necessity defense,

---

being rehired. [The plaintiff], however, has provided none of the evidence necessary to make out a *prima facie* case. Her argument that she was adversely affected by the no-rehire policy is insufficient and does not show a significant discriminatory effect on disabled individuals as a group. Thus, the district court did not err in granting summary judgment on [the plaintiff]'s disparate-impact claim.

*Smith*, 621 Fed. Appx. at 961-62. The decisions that the Eleventh Circuit cited in this passage are not ADA decisions. In *Schwarz*, the Eleventh Circuit examined a disparate impact claim under the Fair Housing Act. *Schwarz*, 544 F.3d at 1217. In *Armstrong*, the Eleventh Circuit examined a disparate impact claim under Title VII. *Armstrong*, 33 F.3d at 1312, 1314. Unlike the ADA, neither the FHA nor Title VII expressly authorizes an individual to maintain a disparate impact claim. *Smith* involved a facially-neutral employment policy, so it falls in the *Raytheon* category of cases that examine the effect of an employment policy on a group of applicants or employees, but not all disparate impact cases concern facially-neutral employment policies. Because it is an unpublished opinion, the *Smith* decision is persuasive authority, not binding precedent. *U.S. v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013). Significantly, Ms. Smith was *pro se*, and she offered little authority to save her claim on appeal. Appellant's Reply Brief at 15-21, *Smith*, 621 Fed. Appx. 955 (No. 14-12566). Nothing in the *Smith* record or in the *Smith* decision suggests that Ms. Smith developed arguments like those on which the EEOC relies in this case. For these reasons, Dollar General's reliance on *Smith* is misplaced.

The Court has located one binding decision in which the Eleventh Circuit evaluated an individual plaintiff's ADA screen out claim under § 12112(b)(6). *Allmond v. Akal. Sec., Inc.*, 558 F.3d 1312 (11th Cir. 2009). Because the Eleventh Circuit based its decision in that case on the business necessity affirmative defense to a § 12112(b)(6) claim, the Eleventh Circuit did not consider the statutory nature of a § 12112(b)(6) claim. *Allmond v. Akal. Sec., Inc.*, 558 F.3d at 1316 ("[W]e focus our attention solely on the affirmative business-necessity defense and its application to the hearing-aid ban. We express no view on whether Allmond is disabled under federal law and just assume that he is disabled for the sake of discussion.").

the defendants must show that the allegedly discriminatory qualification requirement is (i) job-related, (ii) consistent with business necessity, and (iii) that performance cannot be accomplished with a reasonable accommodation." *Williams*, 296 F. Supp. 3d at 790 (citing *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 993 (9th Cir. 2007)).

Here, the EEOC alleges, and the evidence, viewed in the light most favorable to the EEOC and Mr. Jackson, demonstrates, that Dollar General required job applicants to undergo a post-offer medical examination, and Dollar General deemed not qualified for employment in Dollar General's Bessemer warehouse applicants whose corrected vision did not measure 20/50 or better in both eyes, whose blood pressure measured 160/100 or higher, and/or whose blood sugar exceeded a certain threshold.  (Doc. 1, pp. 7-8, ¶¶ 25(b)-(d) & 25(i); Doc. 104-19, p. 362; Doc. 115-16, pp. 2-5, 8; Doc. 115-26, pp. 7-8; Doc. 115-35, p. 6).  The EEOC contends that binocular vision and blood pressure below 160/100 were not job-related requirements for the general warehouse worker position, and the medical qualification standards were not consistent with business necessity.  (Doc. 1, pp. 7-8, ¶¶ 25(e)-(g) & 25(j)).  On its face, Dollar General's policy that screened out applicants whose corrected vision did not measure 20/50 or better in both eyes and whose blood pressure measured 160/100 or higher is direct evidence of intent to

screen out certain job applicants based on medical qualifications standards or criteria.

Viewed in the light most favorable to the EEOC and Mr. Jackson, the summary judgment evidence establishes a prima facie screen out claim under § 12112(b)(6). The EEOC and Mr. Jackson have demonstrated that the unsuccessful job applicants who the EEOC represents, whose corrected vision did not measure 20/50 or better in both eyes or whose blood pressure measured 160/100 or higher, either were disabled or Dollar General regarded those applicants as disabled, and Dollar General's screening standards had an adverse impact on those job applicants.[10]

The ADA defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities of [an] individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

Federal Regulations define a physical impairment as:

_____

[10] There is not sufficient evidence in the record to establish a screen out claim based on an unstated blood sugar level. The Court limits its analysis to unsuccessful job applicants with impaired vision or blood pressure that exceeded 160/100.

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]

29 C.F.R. § 1630.2(h).  The ADA provides that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A). With respect to the meaning of the phrase "substantially limits," the Eleventh Circuit, in *Mazzeo v. Color Resolutions Int'l, LLC*, noted that Congress has amended the statute to ensure that the phrase is interpreted broadly, and:

the EEOC, pursuant to its statutory authority to issue regulations implementing the definition of "disability" in the ADA, *see id.* at § 12205a, has further explained that the phrase "substantially limits" is to be "construed broadly in terms of extensive coverage" and is "not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  The EEOC's regulations also provide that an "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting;" the phrase "substantially limits" "shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA;" (with the exception of glasses or contact lenses) the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures;" and an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity."  *Id.* at § 1630.2(j)(1)(ii), (iv), (vi)-(vii).

*Mazzeo*, 746 F.3d 1264, 1269 (11th Cir. 2014) (adopting the EEOC's interpretation of the phrase "substantially limits"). Similarly, the ADA provides:

> (E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—
>
>> (I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;
>>
>> (II) use of assistive technology;
>>
>> (III) reasonable accommodations or auxiliary aids or services; or
>>
>> (IV) learned behavioral or adaptive neurological modifications.

42 U.S.C. § 12102(4)(E)(i). "In effect, these provisions require courts to look at a plaintiff's impairment in a hypothetical state where it remains untreated." *Lloyd v. Housing Auth. of the City of Montgomery, Ala.*, 857 F. Supp. 2d 1252, 1263 (M.D. Ala. 2012). Courts must "determine the existence of disabilities on a case-by-case basis." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).

Monocular vision – meaning an individual relies on one eye – is a physical impairment because it is a physiological condition that affects an individual's eyes, a "special sense organ." 29 C.F.R. § 1630.2(h)(1). Monocular vision also affects a major life activity, "seeing." 42 U.S.C. § 12102(2)(A). Dollar General argues that monocular vision does not "substantially limit" Mr. Jackson's nor any EEOC class

member's ability to see.  (Doc. 110, pp. 24-26).[11]  Because those with monocular vision "may embrace a group whose members vary by the degree of visual acuity in the weaker eye . . . and the ultimate scope of the restrictions on their visual abilities," those with monocular vision are not *per se* disabled.  *Kirkingburg*, 527 U.S. at 566.

> This is not to suggest that monocular individuals have an onerous burden in trying to show that they are disabled.  On the contrary, our brief examination of some of the medical literature leaves us sharing the Government's judgment that people with monocular vision "ordinarily" will meet the [ADA]'s definition of disability . . . and we suppose that defendant companies will often not contest the issue.  We simply hold that the [ADA] requires monocular individuals, like others claiming the [ADA]'s protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial.

*Kirkingburg*, 527 U.S. at 567 (internal citations omitted).

According to Mr. Jackson, the only member of the plaintiff class with monocular vision to be deposed, from his right eye, he cannot see anything directly ahead of him other than light.  (Doc. 105-8, pp. 105-06, tpp. 104-05).[12]  Mr.

---

[11] Dollar General contends that "particularly in cases where an individual has had monocular vision for a long time and becomes accustomed to primarily using one eye, the condition likely does not substantially impact a major life activity."  (Doc. 110, p. 25) (citing *Littlefield v. Nevada, ex. rel. Dep't of Public Safety*, 195 F. Supp. 3d 1147, 1153-54 (D. Nev. 2016)).  But that is not the law in the Eleventh Circuit; rather, the Court must ignore any "ameliorative effects of mitigating measures."  *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d at 1269 (internal quotations omitted); *see also* 42 U.S.C. § 12102(4)(E)(i).

[12] It appears that Mr. Jackson's peripheral vision from his right eye is not affected by his condition.  (Doc. 105-8, p. 105, tp. 104).  As noted by Dollar General, Mr. Jackson stated during his deposition that he does not consider himself disabled.  (Doc. 105-8, p. 431, tp. 430).  This admission is not dispositive because a reasonable jury may conclude that, due to his condition, Mr. Jackson is disabled under the ADA.

Jackson's inability to see straight ahead with his right eye supports a reasonable inference that "the extent of the limitation in terms of [his] own experience, as in loss of depth perception and visual field, is substantial," *Kirkingburg*, 527 U.S. at 567; which in turn creates a genuine dispute of material fact as to whether he has an actual disability.[13]

Hypertension – also known as high blood pressure – is a physical impairment because it is a physiological condition that affects an individual's cardiovascular system.  29 C.F.R. § 1630.2(h)(1).  And hypertension affects a major life activity, "working."  42 U.S.C. § 12102(2)(A).  As with monocular vision, Dollar General argues that, on the record before the Court, hypertension does not "substantially limit" the EEOC class members' ability to work.  (Doc. 110, pp. 23-24).  Dollar General mistakenly relies on the fact that two EEOC class members with hypertension – Eric Fielder and Willie Copeland – stated that their ability to work is not substantially limited.  (Doc. 110, p. 24).  Dollar General overlooks the fact that both Mr. Fielder and Mr. Copeland take medication for hypertension.  (Doc. 105-14, p. 62, tp. 61; Doc. 111-14, p. 2, ¶ 7).  As noted, a "determination of whether an impairment substantially limits a major life activity shall be made without regard to

---

[13] Carlos Carey, another EEOC class member who has difficulty seeing from one eye, twice failed Middle Creek's eye exam.  (Doc. 115-8, pp. 3, 4, ¶¶ 8, 9, 11).  Mr. Carey failed his second test after he purchased corrective lens.  (Doc. 115-8, p. 4, ¶ 10).  This evidence supports a reasonable inference that Mr. Carey's vision is substantially limited, which in turn creates a genuine dispute of material fact as to whether he has an actual disability.

the ameliorative effects of mitigating measures such as medication."  42 U.S.C. § 12102(4)(E)(i)(I).[14]

While "[n]o pathologic changes occur early in hypertension[,] [s]evere or prolonged hypertension damages target organs (primarily the cardiovascular system, brain, and kidneys), increasing risk of [c]oronary artery disease (CAD) and myocardial infarction, [h]eart failure, [s]troke (particularly hemorrhagic), [r]enal failure, [and] [d]eath[.]" *Toland v. BellSouth Telecommunications, LLC*, NO. 1:15-CV-2441-SCJ, 2017 WL 6380641, at *3 (N.D. Ga. Aug. 9, 2017) (internal footnote omitted)                 (quoting                 MERCK                 MANUALS, https://www.merckmanuals.com/professional/cardiovascular-disorders/hypertension/overview-of-hypertension (last visited July 25, 2022).[15] Because Mr. Fielder and Mr. Copeland have hypertension, jurors reasonably may infer that the men are at risk of suffering the aforementioned maladies in a

---

[14] Dollar General's reliance on *Morgan v. County Comm'n of Lawrence County*, No. 5:14-CV-01823-CLS, 2016 WL 3525357 (N.D. Ala. June 20, 2016), is misplaced.  (Doc. 130, p. 6).  In *Morgan*, the district court stated:  "The Eleventh Circuit also has held that exhaustion and high blood pressure, without more, are not conditions that substantially impair a person's ability to perform major life activities, such as working."  *Morgan*, 2016 WL 3525357, at *28.  The district court cited to two pre-ADAA Eleventh Circuit cases which relied on the now outdated definition of "substantially limits."

[15] In *Harris v. H & W Contracting*, the Eleventh Circuit took judicial notice in the summary judgment context that "'Graves' disease is a condition that is capable of substantially limiting major life activities if left untreated by medication.'"  *Toland v. BellSouth Telecommunications, LLC*, NO. 1:15-CV-2441-SCJ, 2017 WL 6380641, at *3 (N.D. Ga. Aug. 9, 2017) (quoting *Harris v. H & W Contracting Co.*, 102 F.3d 516, 522 (11th Cir. 1996)).  The *Toland* court also took judicial notice of the risks associated with hypertension.  *Toland*, 2017 WL 6380641, at *3.

"hypothetical state where [their hypertension] remains untreated." *Lloyd*, 857 F. Supp. 2d at 1263.[16]  In turn, this creates a genuine dispute of material fact as to whether Mr. Fielder and Mr. Copeland have an actual disability.[17]

In any event, the evidence, viewed in the light most favorable to the EEOC and Mr. Jackson, indicates that Dollar General regarded Mr. Jackson and the other unsuccessful job applicants as disabled.

---

[16] Mr. Fielder has a family history of high blood pressure, (Doc. 105-14, p. 61, tp. 60), and has taken medication for high blood pressure since he was 19 years old, (Doc. 105-14, p. 62, tp. 61). On the day he failed his physical examination at Middle Creek, Mr. Fielder had been off his medication for about a month because he did not have health insurance.  (Doc. 105-14, pp. 78-79, tpp. 77-78).

Mr. Copeland failed two physical examinations at Middle Creek because of high blood pressure. (Doc. 111-14, pp. 2-3, ¶¶ 7-9).  Mr. Copeland failed his first examination after not taking his medication on the day of the exam (due to side effects) and he failed his second examination after starting a different medication.  (Doc. 111-14, pp. 2-3, ¶¶ 7-9).

[17] The Court's analysis here with respect to Mr. Fielder and Mr. Copeland is similar to the analysis in *Toland*, where the Northern District of Georgia found that the risks associated with hypertension coupled with the fact that the plaintiff has hypertension are "sufficient to create a genuine issue of material fact about whether [plaintiff's] medical condition, in the absence of mitigating measures, would substantially limit [his] major life activities [to include the cardiovascular/circulatory systems]."  *Toland*, 2017 WL 6380641, at *4 (quoting *Harris*, 102 F.3d at 522).  Unlike the plaintiffs here, the plaintiff in *Toland* had had "at least one hospitalization for blood pressure." *Toland*, 2017 WL 6380641, at *4 n.9.  But this difference does not dictate a different outcome because jurors reasonably may infer that Mr. Fielder and Mr. Copeland would be at risk of hospitalization if they were to skip their medication for an extended period.

In its brief in support of its motion for summary judgment, Dollar General also relies on *Toland* but for the opposite proposition—that "*Toland*'s assertion that he suffers from hypertension does not establish that this physical impairment substantially limited one or more of his major life activities."  (Doc. 110, p. 23) (quoting *Toland v. BellSouth Telecommunications, Division of AT&T, Inc.*, No. 1:15-cv-02441-SCJ-RGV, 2017 WL 6374873, at *7 (N.D. Ga. May 1, 2017)). Dollar General relies on the magistrate judge's final report and recommendation, rather than the subsequent order from the Northern District of Georgia sustaining the plaintiff's objection on this very point.  *Toland*, 2017 WL 6380641, at *4.

> "[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) . . . . Thus, "[a]n employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity." *Sutton*, 527 U.S. at 490, 119 S.Ct. 2139.

*D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1228 (11th Cir. 2005) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 490 (1999), *superseded by statute*, U.S. Pub. L. No. 110-325). Using physical criteria that Dollar General established for warehouse workers, Middle Creek indicated to Dollar General that Mr. Jackson and the other unsuccessful job applicants were not qualified to work as warehouse workers either because of impaired vision or blood pressure that exceeded 160/100. Using the Middle Creek rating, Dollar General did not offer the applicants a warehouse worker position because Dollar General regarded those applicants' health conditions as limiting their ability to work in the warehouse. Because Dollar General declined to extend job offers to Mr. Jackson and the other unsuccessful job applicants based on real or perceived physical disabilities, Dollar General's screening policy had a negative impact on Mr. Jackson and the other unsuccessful applicants in violation of § 12112(b)(6).

Disputed questions of fact regarding Dollar General's screen out policy preclude judgment in Dollar General's favor based on the company's job-relatedness

and business necessity defenses.  Job-relatedness and business necessity are "distinct pillars of the affirmative defense."  *Allmond*, 558 F.3d at 1317.

> As [the Eleventh Circuit] has explained, "[j]ob[-]relatedness is used in analyzing the questions or subject matter contained in a test or criteria used by an employer in making hiring or promotional decisions." *Hamer*, 872 F.2d at 1533. Business necessity, in contrast, "is larger in scope and analyzes whether there is a business reason that makes necessary the use by an employer of a test or criteria in hiring or promotion decision making." *Id.*

*Allmond*, 558 F.3d at 1317.

Vision tests – meant to assess one's ability to see – and blood pressure tests – meant to assess the likelihood that one may become suddenly incapacitated – are job-related, satisfying the first prong of the test.  This is especially true when the job requires an individual to operate heavy machinery around other workers, as is the case here.  But Dollar General has not met its burden of showing that the physical criteria it set for its warehouse worker position was necessary.  This "defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)).  Dollar General contends that rating candidates "referred to PMD" individualized

assessments.  (Doc. 130, pp. 14-15).  But the evidence, viewed in the light most favorable to the nonmoving parties, indicates that candidates rated "referred to PMD" were effectively screened out because Dollar General did not follow up with those applicants to explain how they could qualify for a warehouse worker position.[18]

The record is replete with evidence from which jurors reasonably may infer that the EEOC class members could safely perform the essential functions of the job, undercutting Dollar General's argument that screening the applicants out was a business necessity.  Notably, many EEOC class members held similar jobs, both before and after applying to work at Dollar General, without incident, despite the medical conditions that caused them to be screened out from Dollar General's warehouse worker position.  (*See e.g.*, Doc. 115-4, p. 3, ¶ 5; Doc. 115-5, p. 3, ¶¶ 3, 4; Doc. 115-6, p. 3, 4 ¶ 3, 6; Doc. 115-7, p. 4, ¶ 9).  Additionally, an EEOC expert witness, Dr. Robert Swotinsky, posited that "[t]here is not a medical or scientific basis for excluding people from general warehouse work (or other jobs) because of

_____

[18] According to the EEOC, the 24 applicants "were not told whether they passed the exam, were not told that they needed medical clearance from their doctor in order to start work, and were not told what medical standard they needed to pass." (Doc. 121, p. 17; *see* Doc. 115-4, pp. 4-6, ¶ 14 (declaration of EEOC class member Roderiquez Crumpton); Doc. 115-5, p. 4, ¶¶ 10-11 (declaration of EEOC class member John Greene); Doc. 115-12, p. 4, ¶¶ 10-11 (declaration of EEOC class member Percy Tate); Doc. 115-9, pp. 4-5, ¶¶ 11-12 (declaration of EEOC class member Orenthal Jordan)).  Thus, viewing the evidence in the light most favorable to the 24 applicants who the EEOC represents, the EEOC has established that Dollar General screened out this group of 24 applicants through its medical examination requirement for job applicants at the Bessemer warehouse.

high blood pressure." (Doc. 115-1, p. 15).[19]  According to another expert witness, Dr. Dawn DeCarlo, "if you have one good eye, you tend to be able to do pretty much everything that everybody else around you can do."  (Doc. 111-4, p. 49, tp. 191). Ultimately, as mentioned above, Dollar General has not met its burden of demonstrating that using its physical qualification standards to screen out candidates was consistent with business necessity.

Thus, the Court denies Dollar General's motion for summary judgment on the EEOC's and Mr. Jackson's ADA "screen out" claim.

### Generic ADA Disparate Treatment Claim

As discussed, in paragraphs 22 through 24 of their respective complaints, the EEOC, on behalf of Mr. Jackson, and Mr. Jackson independently pleaded a generic disparate treatment claim under 42 U.S.C. § 12112(a).[20]  Procedurally, the claim is poorly pleaded.  The Eleventh Circuit Court of Appeals "discourage[s] consideration of 'shotgun' pleadings where the plaintiff asserts multiple claims of relief in single counts and 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'"  *Kennedy v. Bell South Telecommunications,*

---

[19] In Doc. 115-1, Dr. Swotinsky provides reasons for these conclusions.

[20] In Paragraph 22, the EEOC alleges violations of 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(6), but none of the key phrases in § 12112(b)(6) – "screen out," "tend to screen out," "standard," "test," "selection criteria," or "business necessity" – appears in paragraphs 22 through 24.  These omissions indicate that neither the EEOC nor Mr. Jackson intended the claim alleged in paragraphs 22 through 24 to be duplicative of the claim alleged in paragraphs 25 and 26, where the language mirrors that of a screen out claim under § 12112(b)(6).

*Inc. (AT & T)*, 546 Fed. Appx. 817, 820 (11th Cir. 2013) (quoting *Anderson v. Dist. Bd. Of Trs. Of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)). A pleading which lumps multiple claims into a single count fails "to give the defendant[] adequate notice of the claims against [it] and the grounds upon which each claim rests." *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).

While the EEOC and Mr. Jackson "commit[ted] the sin of not separating into a different count each cause of action or claim for relief," *Weiland*, 792 F.3d at 1323, their complaints provided Dollar General with adequate notice that they were bringing a generic disparate treatment claim under § 12112(a). In its brief in support of its motion for summary judgment, Dollar General acknowledged that the EEOC and Mr. Jackson may have pleaded paragraphs 22 through 24 "in an effort to craft a disparate treatment claim" on behalf of Mr. Jackson. (Doc. 110, p. 16 n.15).[21] Dollar General then explained why a disparate treatment claim must fail. (Doc. 110, p. 16 n.15). Accordingly, Dollar General will not be prejudiced by the Court addressing the plaintiffs' § 12112(a) claim on the merits.

Dollar General argues that the plaintiffs' generic disparate treatment claim "fail[s] because there is no evidence of any decisionmaker with unlawful motive:"

---

[21] In its reply brief, Dollar General argues for the first time that the EEOC and Mr. Jackson failed to plead a disparate treatment claim. (Doc. 130, pp. 2-3).

> To the extent Jackson alleges he was treated differently by Dollar
> General because of his monocular vision, it is undisputed that Dollar
> General was unaware of Jackson's monocular vision. The only
> information provided to Dollar General was that Middle Creek had not
> qualified Jackson because he failed the vision exam and had refused to
> complete the physical. While Jackson disputes that he refused to
> complete the remainder of his physical, he cannot dispute what Middle
> Creek relayed to Dollar General, and this justifies Dollar General's
> honest belief that Jackson abandoned the process. This forecloses any
> attempt to impute a discriminatory motive to Dollar General.

(Doc. 110, p. 16 n.15) (internal record citations omitted). But, as discussed above,

Dollar General's version of the facts is disputed. Mr. Jackson testified that he

wanted to continue his examination, but Middle Creek would not allow him to

proceed because his impaired vision could not be corrected.[22]   By producing

evidence that Dollar General did not hire Mr. Jackson because of his monocular

vision, the EEOC and Mr. Jackson have demonstrated that Dollar General acted with

discriminatory intent. Moreover, as explained above, the EEOC and Mr. Jackson

---

[22] On the form that Middle Creek faxed to Dollar General, a Middle Creek employee noted that
the "[patient] failed vision exam + then refused physical." (Doc. 102-9, p. 11). Mr. Jackson
testified that he wanted to finish the exam. (Doc. 105-8, p. 266, tp. 265).

Elizabeth Deslattes, a Middle Creek employee, testified that Mr. Jackson refused to complete his
physical examination after he failed his eye examination. (Doc. 104-1, p. 119). According to Mr.
Jackson, after he failed his eye examination, Brittney Busbee, another Middle Creek employee,
told him that under Dollar General's requirements he was disqualified from consideration for the
job. (Doc. 105-8, p. 373, tp. 372). Therefore, viewing the evidence in the light most favorable to
Mr. Jackson, even if Mr. Jackson refused to complete his physical examination, the effort would
have been futile because he was effectively disqualified by Dollar General's requirement that
"[v]ision must be 20/50 or better." (Doc. 104-19, p. 365).

have established a disputed question of material fact as to whether Mr. Jackson was qualified to perform the essential functions of the warehouse worker job.

Thus, the Court denies Dollar General's motion for summary judgment on the EEOC's and Mr. Jackson's generic disparate treatment claim.

## IV.

The Genetic Information Nondiscrimination Act of 2008 prohibits employers from discriminating based on genetic information and acquiring genetic information. 42 U.S.C. § 2000ff-1. An employee – or an agency, such as the EEOC, acting on behalf of an employee – may bring a GINA claim under subsection (a), "Discrimination based on genetic information;" or subsection (b), "Acquisition of genetic information." 42 U.S.C. § 2000ff-1. Here, the EEOC brings its GINA claim under subsection (b). (Doc. 1, p. 9, ¶ 34; *see also* Doc. 41, p. 9, ¶ 35). Under subsection (b):

> It shall be an unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member of the employee except—
>
> > (1) where an employer inadvertently requests or requires family medical history of the employee or family member of the employee; . . . .

42 U.S.C. § 2000ff-1(b).[23]   Under GINA, "[t]he term 'genetic information' means,

with respect to any individual, information about—"

---

[23] There are six exceptions to subsection (b).  The first exception is quoted above.  The remaining five exceptions are:

> (2) where—
>
> > (A) health or genetic services are offered by the employer, including such services as part of a wellness program;
> >
> > (B) the employee provides prior, knowing, voluntary, and written authorization;
> >
> > (C) only the employee (or family member if the family member is receiving genetic services) and the licensed health care professional or board certified genetic counselor involved in providing such services receive individually identifiable information concerning the results of such services; and
> >
> > (D) any individually identifiable genetic information provided under subparagraph (C) in connection with the services provided under subparagraph (A) is only available for purposes of such services and shall not be disclosed to the employer except in aggregate terms that do not disclose the identity of specific employees;
>
> (3) where an employer requests or requires family medical history from the employee to comply with the certification provisions of section 2613 of Title 29 or such requirements under State family and medical leave laws;
>
> (4) where an employer purchases documents that are commercially and publicly available (including newspapers, magazines, periodicals, and books, but not including medical databases or court records) that include family medical history;
>
> (5) where the information involved is to be used for genetic monitoring of the biological effects of toxic substances in the workplace, but only if—
>
> > (A) the employer provides written notice of the genetic monitoring to the employee;
> >
> > (B)(i) the employee provides prior, knowing, voluntary, and written authorization; or
> >
> > (ii) the genetic monitoring is required by Federal or State law;

(i) such individual's genetic tests,

(ii) the genetic tests of family members of such individuals, and

(iii) the manifestation of a disease or disorder in family members of such individual.

42 U.S.C. § 2000ff(4)(A).

Here, Dollar General does not deny that it violated GINA subsection (b). It is undisputed that, from at least December 2013 until August 22, 2014, pursuant to

---

(C) the employee is informed of individual monitoring results;

(D) the monitoring is in compliance with—

(i) any Federal genetic monitoring regulations, including any such regulations that may be promulgated by the Secretary of Labor pursuant to the Occupational Safety and Health Act of 1970 (29 U.S.C. 651 et seq.), the Federal Mine Safety and Health Act of 1977 (30 U.S.C. 801 et seq.), or the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.); or

(ii) State genetic monitoring regulations, in the case of a State that is implementing genetic monitoring regulations under the authority of the Occupational Safety and Health Act of 1970 (29 U.S.C. 651 et seq.); and

(E) the employer, excluding any licensed health care professional or board certified genetic counselor that is involved in the genetic monitoring program, receives the results of the monitoring only in aggregate terms that do not disclose the identity of specific individuals; or

(6) where the employer conducts DNA analysis for law enforcement purposes as a forensic laboratory or for purposes of human remains identification, and requests or requires genetic information of such employer's employees, but only to the extent that such genetic information is used for analysis of DNA identification markers for quality control to detect sample contamination.

42 U.S.C. § 2000ff-1(b)(2)-(6).

Dollar General's instructions, Dollar General's agent, Middle Creek Medical Center, asked Dollar General job candidates whether their grandparents, parents, or children had significant medical problems, in violation of 42 U.S.C. § 2000ff-1(b). (*See e.g.*, Doc. 104-19, p. 316).[24]   Instead, Dollar General argues that the EEOC and Mr. Jackson lack standing to bring this GINA claim. (Doc. 126, pp. 5-15). Specifically, Dollar General argues that, insofar as the EEOC and Mr. Jackson request compensatory and punitive damages, there is no redressability because GINA does allow for compensatory and punitive damages for claims brought under 42 U.S.C. § 2000ff-1(b). (Doc. 126, pp. 10-12).[25]   As far as the Court can tell, this is an issue of first impression.

In its remedies and enforcement section, GINA incorporates the remedial schemes of other statutes. 42 U.S.C. § 2000ff-6.[26]   With respect to the availability of damages, GINA states:

---

[24] As noted above, under GINA subsection (b), "[i]t shall be an unlawful employment practice for an employer to request . . . genetic information with respect to an employee or a family member of the employee . . . ." 42 U.S.C. § 2000ff-1(b). Dollar General, acting through its agent, Middle Creek Medical Center, is an employer. 42 U.S.C. § 2000e(b); 42 U.S.C. § 2000ff(2)(B)(i). Dollar General's job applicants are employees. 42 U.S.C. 2000ff(2)(A)(i); 42 U.S.C. § 2000e(f). And "genetic information" includes "information about—(iii) the manifestation of a disease or disorder in family members of such individual." 42 U.S.C. § 2000ff(4)(A)(iii). Thus, Dollar General requested genetic information from its employees in violation of GINA.

[25] The EEOC also requests injunctive relief. (Doc. 1, p. 11). Dollar General argues that the Court lacks jurisdiction over a claim for injunctive relief because the company voluntarily ceased the alleged unlawful practice more than six years ago. (Doc. 126, p. 11 n.5).

[26] Subsection (a) applies to "Employees covered by title VII of the Civil Rights Act of 1964." Subsection (b) applies to "Employees covered by Government Employee Rights Act of 1991."

> The powers, remedies, and procedures provided in section 1981a of this title, including the limitations contained in subsection (b)(3) of such section 1981a, shall be powers, remedies, and procedures this chapter provides to the Commission, the Attorney General, or any person, alleging such a practice (not an employment practice specifically excluded from coverage under section 1981a(a)(1) of this title).

42 U.S.C. § 2000ff-6(a)(3).  In turn, 42 U.S.C. § 1981a states, in pertinent part:

> In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 against a respondent who engaged in unlawful discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act, and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

42 U.S.C. § 1981a(a)(1).  According to the Supreme Court, this provision "limits compensatory and punitive damages awards . . . to cases of 'intentional discrimination'—that is, cases that do not rely on the 'disparate impact' theory of discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999) (citing 42 U.S.C. § 1981a(a)(1)).

Dollar General argues that neither the EEOC nor Mr. Jackson alleges intentional discrimination and that, for purposes of § 1981a(a)(1), the Court should treat the EEOC's and Mr. Jackson's GINA claim like a disparate impact claim.

---

Subsection (c) applies to "Employees covered by Congressional Accountability Act of 1995." Subsection (d) applies to "Employees covered by chapter 5 of Title 3." Subsection (e) applies to "Employees covered by section 717 of the Civil Rights Act of 1964."

(Doc. 126, pp. 8-12).  The EEOC's complaint upends this argument.  While citing 42 U.S.C. § 2000ff-1(b) as the basis for its GINA claim, (Doc.1, p. 9, ¶ 34), the EEOC expressly alleges that "Defendant's request for genetic information was not inadvertent," (Doc. 1, p. 10, ¶ 40), and that the unlawful employment practices that the EEOC describes "were and are intentional," (Doc. 1, p. 11, ¶ 44).  Thus, as with the ADA claims in this case, Dollar General's attempt to characterize the claims as unintentional discriminatory effect claims is not persuasive.  The EEOC expressly alleged intentional conduct to support an award of damages for Dollar General's GINA violation.

District courts appear to have assumed that damages are available for claims brought under 42 U.S.C. § 2000ff-1(b).  For example, in *EEOC v. Grisham Farm Products, Inc.*, the United States District Court for the Western District of Missouri ordered the defendant to pay $10,000 "for the damages suffered that are a direct and proximate result of its violations of the ADA, 42 U.S.C. § 12112(d) and GINA, 42 U.S.C. § 2000ff-1(b)."  *Grisham Farm Products, Inc.*, 191 F. Supp. 3d 994, 998 (W.D. Mo. 2016).[27]  Conversely, no court has held that damages are not available under 42 U.S.C. § 2000ff-1(b).

---

[27] *See also Jackson v. Regal Beloit America, Inc.*, NO. 16-134-DLB-CJS, 2018 WL 3078760, at *17 (E.D. Ky. June 21, 2018) (granting the plaintiff's motion for partial summary judgment on her GINA claim under subsection (b) and holding that "damages must be determined by a jury"); *Lee v. City of Moraine Fire Dep't*, No. 3:13-cv-222, 2015 WL 914440 (S.D. Ohio Mar. 3, 2015); *Lowe v. Atlas Logistics Group Retail Servs. (Atlanta), LLC*, 102 F. Supp. 3d 1360 (N.D. Ga. 2015).

Admittedly, GINA's statutory framework does not neatly map onto 42 U.S.C. § 1981a(a)(1)'s remedial scheme.   As discussed, the Supreme Court separates § 1981a(a)(1) into two types of claims:   "intentional discrimination" claims for which compensatory and punitive damages are available and "the disparate impact theory of discrimination," for which compensatory and punitive damages are not available.   *Kolstad*, 527 U.S. at 534 (internal quotation marks omitted).   GINA separates claims into two somewhat different categories:   "[d]iscrimination based on genetic information" and "[a]cquisition of genetic information."   42 U.S.C. § 2000ff-1.   As Dollar General notes, the first type of claim under each statute – "intentional discrimination" under 42 U.S.C. § 1981a(a)(1) and "discrimination based on genetic information" under 42 U.S.C. § 2000ff-1(a) – align neatly.   Both sections expressly address intentional discrimination.[28]   But the second type of claim

---

[28] GINA subsection (a) states:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee; or

(2) to limit, segregate, or classify the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee as an employee, because of genetic information with respect to the employee.

42 U.S.C. § 2000ff-1(a).   By its terms, GINA subsection (a) applies only to intentional discrimination.

under each statute – "the disparate impact theory of discrimination" under 42 U.S.C. § 1981a(a)(1) and "acquisition of genetic information" under 42 U.S.C. § 2000ff-1(b) – are less compatible.

Importantly, though a claim under 42 U.S.C. § 2000ff-1(b) may not involve intent to discriminate, a claim under 42 U.S.C. § 2000ff-1(b) does involve the intentional collection of genetic information.  Under 42 U.S.C. § 2000ff-1(b) an employer may not "request, require, or purchase" certain information.  To "request, require, or purchase" necessarily involves intentional conduct, not benign conduct that produces an unlawful result as in a disparate impact claim.  In fact, § 2000ff-1(b)(1) expressly excludes liability for inadvertent requests for family medical history of an employee or family member of the employee.  GINA explicitly deals with unintentional conduct, not by limiting what remedies are available to a plaintiff, but by excusing liability.  Finally, and most importantly, any argument that a 42 U.S.C. § 2000ff-1(b) claim should be treated like a disparate impact is undercut by the language of GINA itself, which states:  "Notwithstanding any other provision of this Act, 'disparate impact', as that term is used in section 2000e-2(k) of this title, on the basis of genetic information does not establish a cause of action under this Act."  42 U.S.C. § 2000ff-7(a).

GINA's legislative history also suggests that a plaintiff may recover compensatory and punitive damages for claims brought under 42 U.S.C. § 2000ff-

1(b).  When the bill originally was introduced in the House, the provision that would

eventually become 42 U.S.C. § 2000ff-1(b) was nearly identical to the final version:

> Acquisition Of Genetic Information.—It shall be an unlawful
> employment practice for an employer to request, require, or purchase
> genetic information with respect to an employee or a family member of
> the employee (or information about a request for the receipt of genetic
> services by such employee or a family member of such employee)
> except— . . . .

H.R. 493, 110th Cong. § 202(b) (2007).  The only difference is the parenthetical,

which was removed from the bill in the House.  H.R. 493, § 202(b) (as engrossed in

the House, Apr. 25, 2007).[29]  Similarly, the remedies and enforcement section in the

original bill is nearly identical to what would eventually become 42 U.S.C. § 2000ff-

6.  H.R. 493, § 207.  The damages subsection incorporated 42 U.S.C. § 1981a's

remedial scheme.  H.R. 493, § 207(a)(3).[30]

The House Committee on Education and Labor recognized that this bill would

allow an array of damages actions.  H.R. REP. NO. 110-28 (2007) (Conf. Rep.).

Burton J. Fishman, on behalf of the Genetic Information Nondiscrimination in

Employment Coalition, testified before the Committee on Education and Labor.

H.R. REP. NO. 110-28, at 67-68.  In his testimony, Mr. Fishman stated that "[w]hen

---

[29] The original bill included five exceptions, including exception (b)(1) covering inadvertent requests or requirements.  H.R. 493, § 202(b)(1)-(5).  Later, a sixth exception was added covering DNA analysis for law enforcement purposes.  H.R. 493, § 202(b)(6).

[30] Later, the Senate added subsection (f):  "Prohibition against retaliation."  H.R. 493, § 207(f) (as engrossed in the Senate).

a company intentionally discriminates, remedies should be available," but expressed concern over the fact that this bill "resorts to jury trials with punitive and compensatory damages for any violation, without distinction, while will necessarily invite additional litigation." H.R. Rep. No. 110-28, at 67-68. Those writing for the minority in the committee report quoted Mr. Fishman, sharing his concern. H.R. Rep. No. 110-28, at 67. Yet, the language of the bill was not changed to limit the availability of compensatory and punitive damages. Thus, given the language and legislative history of GINA, coupled with the Supreme Court's interpretation of 42 U.S.C. § 1981a(a)(1), the Court finds that compensatory and punitive damages are available for claims brought under 42 U.S.C. § 2000ff-1(b). In turn, the Court also finds that the EEOC and Mr. Jackson have standing to bring their GINA claims, even if their request for injunctive relief is moot, and the EEOC and Mr. Jackson have alleged intentional conduct to support a damages claim.

Alternatively, Dollar General argues that the EEOC's summary judgment motion on its GINA claim "is premature because it depends upon the EEOC establishing proof of damages," (Doc. 126, p. 15), but the EEOC has moved for partial summary judgment only with respect to a GINA violation, not damages, (Doc. 107, p. 1). The Court does not need to determine damages to determine a GINA violation. Thus, the Court grants the EEOC's motion for partial summary judgment on its GINA claim as to liability. Damages under GINA are for a jury to

decide. *Jackson*, NO. 16-134-DLB-CJS, 2018 WL 3078760, at \*17. Additionally, the Court grants summary judgment for Mr. Jackson on his GINA claim pursuant to its power under FED. R. CIV. P. 56(f)(1).

**CONCLUSION**

For the reasons discussed above, the EEOC and Mr. Jackson have established as a matter of law that Dollar General violated GINA. The Court denies Dollar General's motion for summary judgment on the EEOC's and Mr. Jackson's 42 U.S.C. §§ 12112(b)(6) and 12112(a) ADA claims. Finally, the Court regards the EEOC's and Mr. Jackson's 42 U.S.C. § 12112(d)(3) ADA claim as a duplicate claim that the Court will dismiss. By separate order, the Court will set the EEOC's and Mr. Jackson's remaining ADA claims and their GINA claim, with respect to damages, for trial.

**DONE** and **ORDERED** this July 26, 2022.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE